USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11/10/2011_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PAMELA QUINTERO,                              :
                                             :        09 Civ. 6084 (JLC)
                          Plaintiff,         :
                                             :        OPINION AND ORDER
          -v.-                               :
                                             :
RITE AID OF NEW YORK, INC.,                  :
                                             :
                          Defendant.         :
-------------------------------------------------------------x

**JAMES L. COTT, United States Magistrate Judge.**

Pamela Quintero has filed this action against her former employer, Rite Aid of New

York, Inc., pursuant to the Americans with Disabilities Act ("ADA") and the New York State

Human Rights Law ("NYSHRL").  Quintero alleges that she was subjected to unequal terms and

conditions of employment and a hostile work environment, retaliated against, and ultimately

terminated based on her disability.  Rite Aid now moves for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure.  For the reasons discussed below, Rite Aid's motion

for summary judgment is granted as to Quintero's claims of unequal terms and conditions,

hostile work environment, and termination under the ADA, and as to all her state law claims.

The motion for summary judgment is denied as to Quintero's retaliation claim under the ADA.

## I.    BACKGROUND

### A.  Facts

Quintero is a 24-year-old female who began experiencing epileptic seizures when she

was a child.[1]  (Complaint, dated July 6, 2009 ("Compl."), ¶ 2 (Dkt. No. 1); Deposition Transcript

of Pamela Quintero, dated Jan. 18, 2011 ("Quintero Tr."), 86:5-7, attached as Exhibit ("Ex.") H

---

[1]        Unless otherwise noted, the facts are either undisputed or, where disputed, construed in

to the Dempsey Certification, dated Apr. 15, 2011, in Support of Defendant's Motion for

Summary Judgment ("Dempsey Cert.") (Dkt. No. 29);[2] Declaration of Raul Quintero, dated May

20, 2011, in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment

("Quintero Decl."), ¶ 3 (Dkt. No. 34)).  Quintero also suffers from developmental learning

disabilities and was placed in special education classes in school.  (Compl. ¶ 2; Quintero Decl. ¶

4).  In September 2006, on the advice of a neurologist who determined that a brain tumor was the

cause of her seizures, Quintero underwent surgery to have the tumor removed.  (Quintero Tr.:

76:7-77:7; Quintero Decl. ¶ 4).  The surgery was completed without any complications.

(Quintero Tr.: 97:4-7).  Quintero continues to take medication and consults her neurologist on a

monthly basis.  (Quintero Tr.: 60:23-62:8, 97:12-15).

     In January 2007, Quintero was hired to work at a Rite Aid store in Carmel, New York.

(Defendant's Local Rule 56.1(a) Statement of Material Facts in Support of Motion for Summary

Judgment, dated Apr. 15, 2011 ("Def. Statement"), ¶ 1 (Dkt. No. 25)).  Rite Aid is a wholly

owned subsidiary of Rite Aid Corporation, which operates retail stores primarily engaged in

selling prescription and over-the-counter medications.  (Answer, filed July 30, 2009, ¶ 3 (Dkt.

No. 3)).  During her employment, Quintero was supervised by two Rite Aid employees, Janek

Jesman ("Jesman") and George Whalen ("Whalen"), who were the Head Manager and Assistant

Manager, respectively, of the Carmel store.  (Quintero Tr.: 109:24-110:8; Declaration of Pamela

Quintero, dated May 23, 2011, in Support of Plaintiff's Opposition to Defendant's Motion for

---

the light most favorable to Quintero.  The facts summarized here are derived from the
pleadings and submissions on file, including the parties' respective statements of fact
submitted pursuant to Rule 56.1 of the Court's Local Civil Rules.

[2]   Rite Aid's initial submission included two exhibits that revealed Quintero's full date of
birth and social security number.  (Dkt. No. 27).  Pursuant to the Court's Order dated
April 28, 2011, Rite Aid filed redacted versions of the two exhibits on April 29, 2011.
(Dkt. No. 29).

Summary Judgment ("Pamela Quintero Decl."), ¶ 2 (Dkt. No. 35)).  On her job application and in her employment paperwork, Quintero did not indicate that she had any physical disability, mental disability, or learning disability.  (Def. Statement ¶ 2; Dempsey Cert., Ex. D).  Quintero asserts, however, that on her first day of work, her father, Raul Quintero, met with a supervisor and informed him that Quintero had a seizure disorder and had recently undergone brain surgery.  (Quintero Decl. ¶ 8).  Her father explained to the supervisor that although Quintero's doctor had given her the "green light" to work and her seizures were "largely under control," she could still have a seizure.  (Id.).  He requested that the supervisor contact him if Quintero had a seizure at work.  (Plaintiff's Rule 56.1 Counterstatement, dated May 23, 2011 ("Pl. Statement"), ¶ 2 (Dkt. No. 37)).

Under Rite Aid's company policy, in order to accommodate any employee with an alleged disability, Rite Aid must receive medical documentation establishing the disability and setting forth the associated limitations and restrictions.  (Def. Statement ¶ 11).  Though Quintero did not submit any documentation regarding her medical condition along with her employment application, her father offered to make such documentation available if requested by Rite Aid. (Pl. Statement ¶ 6; Quintero Decl. ¶ 6).  Quintero asserts that Rite Aid never made such a request.  (Pl. Statement ¶ 6; Quintero Decl. ¶ 9).  Notwithstanding the absence of medical documentation, each of Quintero's supervisors was made aware of her medical condition. Jesman testified about a conversation he had with Quintero's father, during which he was informed of Quintero's condition.  (Pl. Statement ¶ 7; Deposition Transcript of Janek Jesman, dated Jan. 20, 2011, 27:12-32:9, attached as Ex. I to the Dempsey Cert.).  Whalen testified that Quintero herself told him about her seizure condition and brain surgery on several occasions, and that Quintero had shown him pictures of her brain surgery.  (Pl. Statement ¶ 7; Deposition

3

Transcript of George Whalen, dated Mar. 25, 2011 ("Whalen Tr."), 120:23-126:9, attached as Ex. L to the Dempsey Cert.).

Quintero initially worked as a cashier/stock person and her responsibilities included arranging products on shelves to have them face the same direction. (Answer ¶ 4; Quintero Tr.: 107:11-108:14). She eventually worked in the store's photo department, handling transactions at the cash register and removing film from cameras. (Quintero Tr.: 121:7-11, 122:18-123:11). At some point, Quintero's responsibilities were changed to cleaning, which she alleges other employees were not made to do, and carrying boxes. (Quintero Tr.: 124:21-125:6, 175:23-176:3). Quintero alleges that at times she would have difficulty carrying boxes, and that Whalen would ignore her requests for assistance. (Compl. ¶ 6).

In her deposition testimony, Quintero stated that on multiple occasions Whalen threw items at her, screamed at her in front of customers, and mocked the way she spoke. (Quintero Tr.: 186:9-187:16, 192:19-193:23). Although she was unable to state the exact number of times Whalen behaved this way, she recalled three specific incidents. Quintero described one incident where Whalen corrected her work and then mocked her by laughing with other employees and making funny faces in her direction. (Quintero Tr.: 152:24-156:18). Quintero described another incident where Whalen was looking at her and making fun of her with two other employees. (Quintero Tr.: 158:22-159:10).

The third incident occurred on or about September 4, 2007, and ultimately led to Quintero's alleged termination from Rite Aid. Quintero contends that Whalen screamed at Quintero because she was unable to carry heavy cases of beer. (Quintero Tr.: 146:25-147:23). Whalen's conduct caused Quintero to cry. (Id.). Whalen also repeatedly hit refrigerator doors and mocked Quintero by making "funny faces." (Quintero Tr.: 147:3-23). Quintero told Whalen

that she felt as though she was being treated like "someone with no papers," and she asked why he was behaving in such a manner. (Quintero Tr.: 148:2-15). Whalen responded by saying that Quintero "had to do whatever he said because there were no papers in her file saying she had to be treated differently than anyone else." (Compl. ¶ 8; Pamela Quintero Decl. ¶ 2). Quintero then complained to Whalen that he was discriminating against her, and that she was going to report his conduct. (Compl. ¶ 9). In response, Whalen taunted Quintero by asking "who are you planning to call, [George] Bush?" (Quintero Tr.: 148:2-15).

Quintero alleges that soon after her argument with Whalen, her hours "were reduced significantly, to as little as fifteen hours per week." (Quintero Decl. ¶ 10). On or about October 4, 2007, Quintero was called into a meeting with Whalen and a District Manager, Maryann Durse ("Durse"). (Compl. ¶ 9; Def. Statement ¶ 10). Together, Whalen and Durse presented Quintero with a "Written Notice Form," which contained details of the incident between Whalen and her on September 4, 2007. (Quintero Tr.: 135:11-136:8, 146:6-14; Rite Aid Written Notice Form, dated Sept. 14, 2007, attached as Ex. F to the Dempsey Cert.; Rite Aid Written Notice Form (reverse side), dated Oct. 4, 2007, attached as Ex. G to the Dempsey Cert.). According to Quintero, they demanded that she sign the form. (Id.). Quintero refused. Durse threw the paper at Quintero and told her she was fired. (Quintero Tr. 135:11-136:8, 145:11-22). Quintero was then ordered to leave the store and wait for her ride outside. (Quintero Tr.: 164:6-20). Rite Aid denies this version of events, and contends that Quintero was not terminated, but instead walked out of the meeting and quit. (See Defendant's Memorandum of Law in Support of Motion for Summary Judgment, dated Apr. 15, 2011 ("Def. Mem."), at 3 (Dkt. No. 26)).

On or about July 30, 2008, Quintero timely filed charges of disability discrimination against Rite Aid with the United States Equal Employment Opportunity Commission ("EEOC").

5

(Compl. ¶ 10).  On or about May 11, 2009, Quintero received a Right to Sue letter from the EEOC.  (Id. ¶ 11).

### B.  Procedural History

Quintero filed the Complaint in this action on July 6, 2009.[3]  Quintero alleges claims under the ADA and NYSHRL on the basis of her alleged disability, consisting of unequal terms and conditions of employment, hostile work environment, retaliation, and unlawful termination. (Id. ¶ 1 (p. 4), 13-19).

Following an unsuccessful settlement conference and a period for discovery, on April 18, 2011, Rite Aid moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[4]  Rite Aid also submitted the Dempsey Certification and its Rule 56.1(a) Statement of Undisputed Material Facts.

On May 23, 2011, Quintero filed an opposition to Rite Aid's motion (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated May 23, 2011 ("Pl. Mem.")), along with supporting declarations of Theresa B. Wade ("Wade Decl."), Raul Quintero, Pamela Quintero, and Thomas Kaplan, Psy. D. ("Kaplan Decl.").  (Dkt. Nos. 33-36).[5]  Attached to the Kaplan Declaration, which is dated May 23, 2011, is an undated

---

[3]     The numbering of paragraphs in the Complaint does not proceed sequentially, such that a handful of paragraph numbers are repeated.  For clarity, paragraph numbers that are used more than once in the Complaint will be referred to as "Compl. ¶ __ (p. ___)."

[4]     The parties consented to have this Court handle this case for all purposes under 28 U.S.C. § 636(c) on March 11, 2010.  (Dkt. No. 9).

[5]     Rite Aid asks the Court to disregard Quintero's opposition papers because they were never physically served on Rite Aid.  (Def. Reply. Mem. ¶ 1 n.1).  Rite Aid acknowledges that the papers were filed electronically on the Court's Electronic Case Filing ("ECF") system on May 23, 2011, and it does not dispute that its counsel's e-mail address is part of the ECF record that receives notice of all activity in this case.  Rite Aid's counsel, therefore, would have received an ECF notice upon Quintero's filing her opposition papers on May 23, 2011.  Moreover, Rite Aid filed a reply to Quintero's

6

psychological evaluation by Dr. Kaplan of Quintero completed at the request of the Office of

Vocational and Educational Services for Individuals with Disabilities ("VESID") of the State of

New York. (Kaplan Decl., Ex. A ("Kaplan Report") (Dkt. No. 36-1)).  Rite Aid filed its reply on

June 8, 2011.  (Reply Memorandum to Defendant's Motion for Summary Judgment, dated June

8, 2011 ("Def. Reply Mem.") (Dkt. No. 38)).

## II.   **DISCUSSION**

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is

warranted where the moving party shows that "there is no genuine dispute as to any material

fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of

fact is material if it "might affect the outcome of the suit under the governing law[.]"  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a material fact is genuine "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.;

see also, e.g. Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006).  To

prove the presence or absence of a genuine dispute over any material fact, the parties must cite to

"particular parts of materials in the record," including, among other things, depositions,

documents, affidavits, and declarations. Fed. R. Civ. P. 56(c)(1)(A).

In ruling on a summary judgment motion, a court must resolve ambiguities and draw

factual inferences in favor of the nonmoving party. Anderson, 477 U.S. at 255 (citing Adickes v.

S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)); Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,

404 F.3d 566, 574 (2d Cir. 2005).  Furthermore, "[i]t is a settled rule that '[c]redibility

---

opposition approximately two weeks after it was filed.  Therefore, because Rite Aid had
notice of the opposition papers and an opportunity to reply, and did reply, the Court will
consider the opposition papers.

assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (quoting Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)). "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010). In short, the court is confined to "issue-finding," not "issue-resolution." Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party bears the initial burden of establishing that there are no genuine issues as to any material facts. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). If the moving party meets its initial burden, the nonmoving party must then cite specific facts in the record to establish that there are material issues of fact requiring a trial. See Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998) (citing Celotex, 477 U.S. at 322). To defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted). In addition, "circumstantial evidence may be . . . sufficient to raise a genuine issue of material fact precluding the grant of summary judgment." Gayle v. Gonyea, 313 F.3d 677, 684 (2d Cir. 2002).

Courts must be "especially cautious" when deciding whether to grant summary judgment in discrimination cases because direct evidence of an employer's intent to discriminate is rare.

8

Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).  Courts therefore must scrutinize the record "for circumstantial evidence that could support an inference of discrimination." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996).  "Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (quotation marks and citations omitted); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("summary judgment may be appropriate even in the fact-intensive context of discrimination cases").

## B. Evidentiary Challenge to Kaplan Declaration

As a threshold matter, Rite Aid challenges the admissibility of the Kaplan Declaration and Kaplan Report on the grounds that they are unsworn, not notarized, and not made upon personal knowledge, and should therefore be considered inadmissible hearsay.  (Def. Reply Mem. ¶ 13).  Rule 56 provides that an affidavit submitted in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (citations omitted).

To be admissible in a summary judgment proceeding, an affidavit must be sworn to before an officer authorized to administer oaths, such as a notary public.  See Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985).  Alternatively, under 28 U.S.C. § 1746, an unsworn declaration made under the penalty of perjury has the same evidentiary weight as an affidavit if it includes language in substantially the same form as "I declare (or certify, verify, or state) under

9

penalty of perjury that the foregoing is true and correct" followed by a signature and date of execution. See, e.g., LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) (unsworn letter that met requirements of 28 U.S.C. § 1746 deemed admissible as affidavit in summary judgment); Williams v. Elzy, No. 00 Civ. 5382 (HBP), 2003 WL 22208349, at *5 (S.D.N.Y. Sept. 23, 2003) (same). In his Declaration, Kaplan "declares under penalties of perjury that [his] statements are true," and his signature and the date appear at the end of the document. (Kaplan Decl. ¶ 1). Kaplan's unsworn declaration, therefore, meets the requirements of Section 1746 and is admissible evidence that may be considered in ruling on the pending motion.

By contrast, the Kaplan Report is unsworn and, if it had been submitted on its own, would be inadmissible. Although it is signed, it is not declared to be true under penalty of perjury and is undated. See, e.g., United States v. All Right, Title & Interest in Real Prop. & Appurtenances, 77 F.3d 648, 657-58 (2d Cir. 1996) ("unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court"); Dukes v. City of New York, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("unsworn statements are not admissible to controvert a summary judgment motion"). Nonetheless, an unsworn medical report supported by an appropriate affidavit may be considered in opposition to a summary judgment motion. See, e.g., Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("[U]nsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. [56(c)(4)], and cannot be used to defeat a summary judgment motion without additional affidavit support.") (emphasis added); Nasrallah v. Helio De, No. 96 Civ. 8727 (SS), 1998 WL 152568, at *4 (S.D.N.Y. Apr. 2, 1998) (unsworn medical reports are "patently not competent evidence" and are inadmissible to oppose summary

judgment when attached to attorney affidavit because counsel has neither first-hand knowledge of facts nor medical expertise).

Here, Kaplan himself affirms that his statements are based on personal knowledge and authenticates his psychological evaluation of Quintero.  He states that the document attached to his Declaration is a "true and correct" copy of an evaluation that he conducted of Quintero "on or about May 6, 2009," and whose "information and conclusions . . . are true and correct to the best of [his] knowledge and information[.]"  (Kaplan Decl. ¶ 2).  In light of Kaplan's representations, the evidence is "sufficient to support a finding that the matter in question is what [Kaplan] claims."  Fed. R. Evid. 901(a).  The Court therefore will consider both Kaplan's Declaration and his Report in adjudicating Rite Aid's summary judgment motion.[6]

### C.  Summary Judgment Under the ADA and NYSHRL

The ADA creates a private right of action for disability-based employment discrimination, prohibiting discrimination in the workplace "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other

---

[6]     Rite Aid also challenges the Kaplan Report because it contains no information about Quintero's condition during the relevant period in 2007 (as the evaluation took place in 2009).  (See Def. Reply Mem. ¶ 14).  This argument goes to the weight the Court should give the Report, not its admissibility.  See, infra, at p. 20.

In addition, to the extent that Rite Aid raises a double-hearsay argument—that is, the Kaplan Report contains hearsay because it is based on statements made by Quintero to Dr. Kaplan during the evaluation (Def. Reply Mem. ¶ 15)—it is without merit.  Kaplan's Report can be based on patient statements, since these are facts "of a type reasonably relied upon by experts in" Kaplan's field and "need to be admissible in evidence in order for the opinion . . . to be admitted."  Fed. R. Evid. 703; see also Fed. R. Evid. 703, Advisory Comm. Notes, 1972 Proposed Rules ("a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients").

terms, conditions, and privileges of employment." 42 U.S.C. § 12112.[7] The NYSHRL provides

that an employer, on the basis of an individual's disability, cannot "bar or . . . discharge from

employment such individual or . . . discriminate against such individual in compensation or in

terms, conditions or privileges of employment." N.Y. Exec. Law. § 296(1)(a); see also Kinneary

v. City of New York, 601 F.3d 151, 158 (2d Cir. 2010) ("same elements" must be proven to

establish ADA and NYSHRL disability discrimination claims). Quintero asserts four claims of

disability discrimination under the ADA and NYSHRL: unequal terms and conditions, hostile

work environment, retaliation, and termination. (Compl. ¶¶ 1 (p. 4), 13-19).

Quintero's claims of discrimination must be analyzed under the burden-shifting analysis

set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

See McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (applying

burden-shifting framework to ADA discrimination claims); Dawson v. Bumble & Bumble, 398

F.3d 211, 216-17 (2d Cir. 2005) (applying burden-shifting framework to NYSHRL

discrimination claims). Under this framework, a plaintiff has the initial burden to establish a

prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. "The burden of

---

[7]     In 2008, Congress amended the ADA and stated explicitly that the Amendments "shall become effective on January 1, 2009." See ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008). Courts in the Second Circuit have held that the 2008 ADA Amendments are not retroactive and have applied the pre-Amendment ADA to events taking place prior to January 1, 2009. See, e.g., Wega v. Ctr. for Disability Rights, 395 F. App'x 782, 784 n.1 (2d Cir. 2010) (summary order) (2008 ADA Amendments are not retroactive); Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 88 n.2 (2d Cir. 2010) (summary order) (same); Kravar v. Triangle Servs., No. 06 Civ. 7858 (RJH) (FM), 2009 WL 805807, at *4 (S.D.N.Y. Mar. 27, 2009) (same); see also Fernandez-Vargas v. Gonzales, 548 U.S. 30, 37 (2006) (noting "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication") (internal quotation marks and citation omitted). Here, the Court will apply the pre-Amendment ADA because it was in effect at the time of Quintero's alleged discrimination in 2007. See, e.g., Casseus v. Verizon N.Y., Inc., 722 F. Supp. 2d 326, 346 n.14 (E.D.N.Y. 2010) (applying pre-Amendment ADA to discrimination claim arising from plaintiff's termination in June 2007).

establishing a prima facie case is not a heavy one. One might characterize it as minimal." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). If the plaintiff succeeds in establishing a prima facie case, there is "a presumption that the employer discriminated against the employee in an unlawful manner." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. If the defendant carries that burden, the burden shifts back to the plaintiff to prove that the defendant's proffered explanation is a pretext for actual discrimination. Id. at 804-05. The ultimate burden of persuasion remains with the plaintiff at all times. Id. at 804.

### D. ADA Unequal Terms and Conditions Claim

Quintero asserts that Rite Aid discriminated against her on account of her disability by subjecting her to unequal employment terms and conditions. Specifically, Quintero alleges that unlike other employees at her level, she was made to sweep and mop the floors, and carry heavy boxes without assistance. (Compl. ¶¶ 6, 1 (p. 4), 15). To establish a prima facie case of disability discrimination, Quintero must show "(a) that [her] employer is subject to the ADA; (b) that [she] is disabled within the meaning of the ADA or perceived to be so by [her] employer; (c) that [she] was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that [she] suffered an adverse employment action because of [her] disability." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008). Any adverse employment action because of a disability necessarily requires that a defendant know that a plaintiff is disabled. See Raytheon Co. v. Hernandez, 540 U.S. 44, 54 n.7 (2003); Brady, 531 F.3d at 135. Rite Aid does not dispute that it is subject to the ADA, and does not challenge whether Quintero was qualified to perform the essential functions of her job. The parties dispute

13

whether Quintero was disabled within the meaning of the ADA and whether she suffered an

adverse employment action because of her disability.

### 1.    Disabled Within the Meaning of the ADA

To prevail on a disability discrimination claim under the ADA, Quintero must establish

that she was disabled within the meaning of the ADA.[8]  The ADA defines disability "'with

respect to an individual'" and "makes clear that Congress intended the existence of a disability to

be determined in such a case-by-case manner." Toyota Motor Mfg., Ky., Inc. v. Williams, 534

U.S. 184, 198 (2002), superseded by statute on other grounds, ADA Amendments Act of 2008,

Pub. L. 110-325, 122 Stat. 3553 (2008) (quoting 42 U.S.C. § 12102(2)).  Under the ADA,

---

[8]    Rite Aid's principal challenge to Quintero's claim of disability is predicated on Quintero's statements at her deposition, in response to questions from counsel, that she did not have a physical or learning disability while working at Rite Aid and that she does not currently have such a disability. (Def. Statement ¶¶ 3, 5; Quintero Tr.: 101:14-17, 102:9-16, 172:23-175:2).  Quintero's father responds that his daughter's "intellectual disability inhibits her ability to understand the nature of her disabilities or the fact that she has disabilities," and that she was confused at her deposition. (Quintero Decl. ¶ 12; Pl. Statement ¶ 3).  Rite Aid argues that Mr. Quintero's position is without merit because his daughter has not previously asserted that she was unable to answer such questions and, moreover, her lawyers did not make any corrections to the transcript after the deposition. (Def. Reply Mem. ¶¶ 3, 4).  Quintero's admission, Rite Aid contends, is dispositive evidence that she was not disabled during the relevant time period.

As a factual matter, the Court observes that Quintero's answers at her deposition hardly constitute an unequivocal admission.  The answers, when read in context, are at best inconclusive.  At different points, Quintero answered nearly identical questions with different responses and appeared confused by the nature of the questions.  For example, Quintero gave seemingly contradictory answers to two similar questions relating to the presence of any physical disability in 2007. (Quintero Tr.: 174:13-16, 174:20-23).  Nevertheless, the Court notes that Quintero failed to make any changes to her deposition transcript and her counsel has not cited any authority for the proposition that the Court disregard a portion of the deposition testimony because of Quintero's alleged inability, unsupported by any submitted medical evidence, to understand the nature of her disabilities.  In any event, given that the Court's consideration of Quintero's statements does not affect the outcome of Rite Aid's motion, the Court declines to accept Rite Aid's arguments that Quintero's apparent admissions are dispositive of whether she was disabled or not while employed at Rite Aid.

14

"disability" is defined in three alternative ways:  (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded as having such an impairment.  See 42 U.S.C. § 12102(2); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 150 (2d Cir. 1998).  Quintero contends that she was disabled under all three definitions, and that she suffered from a physical impairment because of epileptic seizures, and a mental impairment from her learning disability.  (Pl. Mem. at 10, 12).  Furthermore, Quintero must establish that she was disabled under the ADA during the relevant time period, which in this case is between January and October 2007.  See, e.g., Miller v. McHugh, No. 09 Civ. 7425 (SAS), 2011 WL 4091466, at *9 (S.D.N.Y. Sept. 14, 2011) (summary judgment granted because plaintiff not disabled in relevant time period).  For the reasons explained below, the Court finds that Quintero was not disabled within the meaning of the ADA due to either her seizure disorder or learning disability.

### a.   Quintero's Seizure Disorder and Learning Disability Are Not Impairments That Substantially Limit a Major Life Activity

To establish a disability under the first subsection of the ADA's definition of disability, Quintero must (a) prove that she suffers from a physical or mental impairment, (b) identify the activity that is claimed to be impaired and establish that such activity constitutes a "major life" activity, and (c) demonstrate that her physical or mental impairment "substantially limits" the identified "major life activity."  See Jacques v. DiMarzio, Inc., 386 F.3d 192, 201 (2d Cir. 2004).  Since the ADA does not define "physical or mental impairment," "major life activities," or "substantial limitation," courts have looked to the EEOC's administrative regulations for guidance.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 479-80 (1999), superseded by statute on other grounds, ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008); see also Toyota, 534 U.S. at 197 (the terms "substantially limits" and "major life

activity" "need to be interpreted strictly to create a demanding standard for qualifying as disabled"). Even though these administrative regulations are not binding, courts in the Second Circuit afford them great deference. See, e.g., Francis v. City of Meriden, 129 F.3d 281, 284 n.1 (2d Cir. 1997); De La Rosa v. City of New York Police Dep't, No. 09 Civ. 5290 (SAS), 2010 WL 4177626, at *5 (S.D.N.Y. Oct. 22, 2010).

Under the EEOC regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1) (2007). Epilepsy is generally considered to be a physical impairment under the ADA. See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 216 (2d Cir. 2001) ("well established" that "epilepsy constitutes a disability under the ADA"); Franklin v. Consol. Edison Co. of N.Y., Inc., No. 98 Civ. 2286 (WHP), 1999 WL 796170, at *11 (S.D.N.Y. Sept. 30, 1999) (idiopathic seizure disorder, or epilepsy, is a physical impairment that affects the neurological and musculoskeletal systems). Likewise, a learning disability is a mental impairment under the ADA. The EEOC defines "mental impairment" as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h). Therefore, both an epilepsy disorder and learning disability are recognized impairments under the ADA.

Not every impairment, however, "is a disability within the meaning of the ADA; rather there are two additional requirements: the impairment must limit a major life activity and the limitation must be substantial." Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir.

2005) (citing 42 U.S.C. § 12102(2)(A)).  Major life activities are those "that are of central importance to daily life."  Toyota, 534 U.S. at 197.  The EEOC regulations define major life activities to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  The Second Circuit has "assume[d] without deciding" that "'sitting, standing, lifting, or reaching'" are major life activities.  See Colwell v. Suffolk Cnty. Police Dep't, 158 F.3d 635, 642-43 (2d Cir. 1998) (citation omitted), superseded by statute on other grounds, ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008).  "In deciding whether a particular activity is a 'major life activity,' [the court asks] whether that activity is a significant one within the contemplation of the ADA, rather than whether that activity is important to a particular plaintiff."  Colwell, 158 F.3d at 642.

Under the EEOC regulations, "substantially limits" means "[u]nable to perform a major life activity that the average person" can perform, or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to" the average person.  29 C.F.R. § 1630.2(j)(1)(ii).  To meet either of these requirements, Quintero must present evidence regarding:  (1) the nature and severity of her impairments, (2) the duration or expected duration of her impairments, and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from her impairments.  See 29 C.F.R. § 1630.2(j)(2); Toyota, 534 U.S. at 196-98; Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 871 (2d Cir. 1998).

### 1)  Quintero's Epilepsy Does Not Substantially Limit Any Major Life Activity

While a reasonable jury could find that Quintero is impaired by her epilepsy, the record is insufficient to permit a trier of fact to conclude that it substantially limits any major life

activities, including those identified by Quintero in the Complaint.  Quintero contends that her epilepsy impairs her ability to perform manual tasks, care for herself, and work, each of which is recognized as a major life activity.  (Compl. ¶ 2 (p. 1)).  See 29 C.F.R. § 1630.2(i).  Quintero's father declares that because of her "medical condition[,]" Quintero "could not do many things that an average 20 year old could do" while she was employed at Rite Aid.  (Quintero Decl. ¶ 13).  Specifically, he states that Quintero could not drive, live on her own, handle her own finances, file taxes or pay bills, or take care of her own medical needs, and had limited ability to read or do math.  (Id.).  The Kaplan Report diagnoses Quintero with a "seizure disorder," but does not otherwise discuss the nature of the impairment.  This evidence is insufficient to permit a jury to find a substantial limitation of a major life activity for several reasons.

The statements by Quintero's father fail to provide sufficient specific, non-conclusory information regarding the nature and severity of Quintero's physical impairment, its expected duration, or its long-term impact.[9]  To be sure, the record is not without details regarding the extent of Quintero's seizure disorder.  For example, Quintero's father asserts that his daughter's seizures began at age nine, that she "suffered continuously" until age 19, that the seizures would cause a brief loss of consciousness, and that in 2006 she underwent a brain tumor removal surgery that was intended to make her "seizures less frequent and more manageable."  (Quintero Decl. ¶¶ 3, 5).  These statements suggest, and it may very well be the case, that Quintero's

---

[9]     Although Quintero argues that her epilepsy substantially limits the major life activity of working (Compl. ¶ 2 (p. 1)), she fails to assert any specific factual allegations regarding the extent of that limitation.  She does, however, contend that she struggled to lift heavy cases of beer while working at Rite Aid.  (Id. ¶ 8).  To the extent Quintero is asserting that her epilepsy substantially limited her ability to work because she had difficulty lifting heavy objects, that argument fails as a matter of law.  An inability to lift heavy items is not a substantial limitation of one's ability to work.  See Colwell, 158 F.3d at 644-45 (inability to lift "very heavy objects" did not impair a major life activity); see, infra, at p. 29.

impairments affect her capacity to perform certain life functions.  However, "it is not enough for a plaintiff to prove that an impairment 'implicates' a major life activity—he or she must prove that it is the impairment that 'substantially limits' the activity." Bartlett v. N.Y. State Bd. of Law Exam'rs, 226 F.3d 69, 84 (2d Cir. 2000); see Ryan, 135 F.3d at 870 ("courts have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities") (emphasis in original).

To that end, Quintero's father's statements, and the supporting medical evidence, simply do not provide enough information regarding Quintero's epilepsy disorder to support a finding that Quintero is disabled under the ADA.  The Court is left to speculate as to several critical questions about her seizures, including, for example, their frequency, which is particularly important given that she underwent brain surgery in September 2006.[10]  Because that surgery took place prior to Quintero's employment with Rite Aid, and since it was intended to "make [her] seizures less frequent and more manageable," the result of the surgery is directly relevant to whether Quintero in fact suffered from a seizure disorder during the relevant time period. (Quintero Decl. ¶ 5).  This is especially true because Quintero's father alleges that he told Whalen, at the start of Quintero's employment with Rite Aid in January 2007, that her seizures were "largely under control."  (Id. ¶¶ 5, 8).  While Quintero states that prior to the surgery she experienced two to three seizures a day, she was unable to state how frequently she suffered

---

[10]   It is worth noting that the record is entirely devoid of any direct evidence of Quintero's surgery, such as hospital records or medical reports by a surgeon or neurologist.  Basic facts regarding the surgery are missing from Quintero's submissions, including, for example, the name of the hospital where the surgery was performed, the date of the surgery, the length of any hospital stay, or the precise medical diagnosis connecting Quintero's brain tumor with her seizures.  Even the location of the hospital where the surgery was performed is in question, with Quintero testifying that it took place in Arizona but her opposition papers asserting that it took place in Texas.  (Quintero Tr.: 70:24-72:2; Pl. Mem. at 11).

19

from seizures after the surgery. (Quintero Tr.: 86:14-15, 97:19-98:14, 102:4-8). Dr. Kaplan's report is similarly silent with respect to the frequency of Quintero's seizures after her brain surgery in 2006; indeed, his report carries little weight as it reflects his examination of Quintero more than two years after her employment with Rite Aid. In light of the fact that Quintero must establish that she suffered from her disorder during the relevant time period, the Court cannot conclude from the evidence in the record that a jury could find that Quintero was in fact experiencing seizures in or around the time she worked at Rite Aid.

The only possible evidence regarding the extent of Quintero's seizures during her employment is her father's caution to Whalen at the start of her employment that "there was a possibility that [Quintero] could have a seizure[.]" (Quintero Decl. ¶ 8). But that statement is unsupported by even the most elemental facts, such as the date of Quintero's most recent seizure. See DeFabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 81 (2d Cir. 2010) (nonmoving party "must do more that simply show that there is some metaphysical doubt as to the material facts, . . . and [she] may not rely on conclusory allegations or unsubstantiated speculation") (internal quotation marks and citations omitted). Without that information, no trier of fact would have any basis to link the frequency and severity of Quintero's seizures with any alleged limitation on a major life activity. This information is especially critical for a seizure disorder, as courts have held that disorders resulting in episodic or temporary restrictions, even if caused by a lifelong impairment, do not rise to the level of a substantial limitation of a major life activity because they are insufficient in duration and long-term impact. See, e.g., Ryan, 135 F.3d at 871-72 (plaintiff's ulcerative colitis of the rectum did not substantially limit major life activity because plaintiff would sometimes go years without experiencing symptoms, and any symptoms varied in intensity); Tojzan v. N.Y. Presbyterian Hosp., No. 00 Civ. 6105 (WHP), 2003 WL

1738993, at *7-8 (S.D.N.Y. Mar. 31, 2003) (no substantial limitation of major life activity where plaintiff's back problems were episodic and not consistently severe); see also E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001) (plaintiff who experienced seizures once to twice a week was not substantially limited in major life activities of sleeping, thinking, or caring for herself). Indeed, "[t]o hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds." Sara Lee, 237 F.3d at 352.

Moreover, Quintero appears to be taking antiseizure medication (Quintero Tr.: 61:6), which, according to the Kaplan Report, "effectively control[s] the problem." (Kaplan Report at 2, 9; Quintero 61:4-62:8). The effect of medication is central to any consideration of whether an impairment is substantially limiting. See Sutton, 527 U.S. at 482 (effect of measures taken to correct, or mitigate, physical or mental impairments "must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the [ADA]"). Where the use of medication prevents seizures, courts have found that a plaintiff is unable to establish a disability under the ADA. See, e.g., Charneco v. Dep't of Educ., No. 04 Civ. 1848 (AKH), 2006 WL 148934, at *3 (S.D.N.Y. Jan. 18, 2006). Absent additional information regarding the effect of Quintero's medication on the nature of her seizures and their impact on her daily life, including the possibility that her seizures were under control during the relevant time period, no jury could determine how, if at all, Quintero's seizures affected her ability to perform manual tasks, care for herself, or work. Quintero therefore has failed to establish that her seizure disorder constitutes a disability under the first subsection of the ADA.

### 2) Quintero's Learning Disability Does Not Substantially Limit Any Major Life Activity

The effect of Quintero's learning disability is similarly unsupported by any specific evidence to allow a jury to determine that it substantially limits one or more major life activities. In the Complaint, Quintero asserts that her learning disability "has an impact on all activities of central importance to her daily life, including learning and thinking." (Compl. ¶ 2 (p. 1)). In his Declaration, Quintero's father states that Quintero's learning disability "had a very significant impact on her functioning" while she was employed at Rite Aid, and states that she could not drive, live on her own, handle her own finances, file taxes or pay bills, take care of her own medical needs, and had limited ability to read or do math. (Quintero Decl. ¶ 13).

Of Quintero's identified major life activities, learning is a recognized major life activity. See 29 C.F.R. § 1630.2(i).[11] To the extent that taking care of one's own medical needs constitutes taking care of oneself, it also is a major life activity. However, some of the activities that Quintero specifically identifies do not rise to the level of major life activities. See, e.g., Colwell, 158 F.3d at 643 (driving is not a major life activity); MacGovern v. Hamilton Sunstrand Corp., 170 F. Supp. 2d 301, 308 (D. Conn. 2001) (doing taxes is a "relatively minor undertaking[]" and not a major life activity). Compare Pare v. City of Bristol, 386 F. Supp. 2d 43, 52 (D. Conn. 2005) (thinking "has not been recognized as a separate major life activity") with Baerga v. Hosp. for Special Surgery, No. 97 Civ. 0230 (DAB), 2003 WL 22251294, at *4 (S.D.N.Y. Sept. 30, 2003) (citing EEOC Enforcement Guidance: The Americans with

---

[11]     Quintero asserts that she is limited in "all activities of central importance to her daily life." (Compl. ¶ 2). This, however, is the very definition of a "major life activity." See Toyota, 534 U.S. at 197 (major life activities are "activities that are of central importance to daily life"). Since Quintero's statement would implicate nearly every possible major life activity, it is impermissibly broad. The Court declines to speculate as to how Quintero's learning disability substantially limits any and all major life activities and will instead focus only on those activities that Quintero has specifically identified.

Disabilities Act and Psychiatric Disabilities, EEOC Notice Number 915.002) (thinking is included on an EEOC list of major life activities).

Despite having identified certain major life activities, Quintero has failed to submit sufficient evidence to establish that her learning disability substantially limits any of those activities. First, as with Quintero's seizure disorder, the record does not establish several basic facts with respect to Quintero's learning disability. Quintero's submitted evidence does not describe the duration of Quintero's learning disability, its long-term impact, or the effect of any correcting or mitigating measures. See Sutton, 527 U.S. at 481-82. Similar to Quintero's assertion that she was hospitalized for brain surgery in 2006, Quintero's statement that she "was diagnosed with learning disabilities" at some unspecified point in the past is not supported by any medical evidence. (Quintero Decl. ¶ 4). The record is bereft of any information regarding this alleged diagnosis or any details about the nature of the disability over the course of Quintero's life.

While Quintero has not presented any evidence of her mental impairment before and during her employment at Rite Aid, she is able to establish the presence of a learning disability as early as 18 months after her employment ended. Quintero relies extensively on the findings from Dr. Kaplan's report, which is entitled "Comprehensive Psychological Evaluation" and was completed for purposes of determining Quintero's eligibility for social services from VESID. (Quintero Decl. ¶ 4; Kaplan Report at 1). The Report includes Dr. Kaplan's observations regarding Quintero's background and behavior. After completing several achievement and intelligence assessments, Dr. Kaplan finds that Quintero has an IQ of 67, which is below that of most of her peers. (Kaplan Report at 4-7). Dr. Kaplan diagnoses Quintero with "mild mental retardation." (Kaplan Report at 8). However, the undated report appears to have been based on

tests that were completed on May 6, 2009, well after Quintero stopped working at Rite Aid. (Kaplan Report at 1). Further, the Report makes no reference to the nature of Quintero's mental impairments around the time of her employment at Rite Aid, or that her learning disability is a lifelong impairment. The Report would therefore be of no assistance to a fact-finder in deciding whether Quintero's learning disability substantially limited a major life activity during the relevant time period in this case.

Even if the Kaplan Report had offered an assessment of Quintero's learning disability in 2007, however, it would still be insufficient to establish that her "mild mental retardation" causes substantial limitation of any major life activity. "It is insufficient for [Quintero] to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires [Quintero] . . . to prove a disability by offering evidence that the extent of the limitation caused by [her] impairment in terms of [her] own experience is substantial." Toyota, 534 U.S. at 198 (emphasis added) (internal quotation marks and citations omitted). Neither Kaplan's statements nor Quintero's arguments provide any specific evidence on how Quintero's learning disability substantially limits a major life activity. Assertions by Quintero's father—that, for example, Quintero is unable to care for her medical needs—amount to little more than declarative statements, as they are unsupported by specific examples (or, in the case of medical needs, what Quintero's medical needs are). Apart from those statements, Quintero is left to rely on Dr. Kaplan's report, which offers only psychological diagnoses from outside the relevant time period, not any assessment of the effect of Quintero's "mild mental retardation" on her day-to-day activities from January 2007 to October 2007. In light of these evidentiary deficiencies, the Court finds that Quintero has not established that her learning disability constitutes a disability as defined under the first subsection of the ADA.

### b.  Quintero Does Not Have A Record of Impairment

The second subsection of the ADA's definition of disability allows a plaintiff to prove a

disability if she has a record of physical or mental impairment.  42 U.S.C. § 12102(2)(B).

Quintero argues that her history of seizures constitutes a record of physical impairment that

substantially limited one or more of her major life activities.  The EEOC regulations define

"record of impairment" as where a person "has a history of, or has been misclassified as having,

a mental or physical impairment that substantially limits one or more major life activities."  29

C.F.R. § 1630.2(k).  Quintero argues that her hospitalization in connection with her brain surgery

in 2006 sufficiently represents a record of a substantially-limiting physical impairment.  In doing

so, she relies on two cases where courts have found a record of impairment based on

hospitalization and specifically noted that an impairment that was "serious enough to require

hospitalization" was one that substantially limited one or more major life activities.  (Pl. Mem. at

10 (citing School Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 281 (1987) (finding record of

impairment based on plaintiff's hospitalization for acute tuberculosis); and Mark v. Burke

Rehabilitation Hosp., No. 94 Civ. 3596 (RLC), 1997 WL 189124, at *4 (S.D.N.Y. Apr. 17,

1997) (finding record of impairment based on plaintiff's hospitalization for cancer surgery))).

The first, and most obvious, problem with Quintero's argument here is the complete

absence of any evidence relating to her hospitalization, such that there is no "record" of

hospitalization.  See supra at n.11.  Moreover, as a matter of law, by asserting that the fact of her

hospitalization is, by itself, sufficient to establish a disability under the ADA, Quintero ignores

binding authority that leads to exactly the opposite conclusion.  In Colwell, the Second Circuit

quoted the Fifth Circuit's observation that Arline

> cannot be construed to obviate the requirement, explicit in the ADA and its
> implementing regulations, that purported conditions be examined to ascertain

25

> whether a specific condition substantially limited a major life activity. *The ADA requires an individualized inquiry beyond the mere existence of a hospital stay.* Although the Court in <u>Arline</u> noted that the plaintiff's hospitalization established a record of impairment, the defendant had conceded that her acute tuberculosis had been substantially limiting . . . . [The contrary reading of <u>Arline</u>] would work a presumption that any condition requiring temporary hospitalization is disabling-a presumption that runs counter to the very goal of the ADA.

158 F.3d at 645-46 (quoting <u>Burch v. Coca-Cola Co.</u>, 119 F.3d 305, 317 (5th Cir. 1997))

(alteration and emphasis in original). Quintero's argument that her hospitalization for brain

surgery establishes a disability under the ADA runs up against the very same presumption that

<u>Colwell</u> and <u>Burch</u>, and many other decisions, seek to avoid. <u>See</u> <u>Taylor v. U.S. Postal Serv.</u>,

946 F.2d 1214, 1217 (6th Cir. 1991) (<u>Arline</u> should not be read "as establishing the nonsensical

proposition that any hospital stay is sufficient to evidence a 'record of impairment'"); <u>see, e.g.</u>,

<u>Horwitz v. L. & J.G. Stickley, Inc.</u>, 20 F. App'x 76, 80 (2d Cir. 2001) (summary order)

("Because past hospitalization, even coupled with continued treatment, does not create a record

of a substantially limiting medical condition, the plaintiff was not protected by the ADA."); <u>Berk</u>

<u>v. Bates Advertising USA, Inc.</u>, 25 F. Supp. 2d 265, 267 (S.D.N.Y. 1998) ("Given the Second

Circuit's analysis in <u>Colwell</u>, I can no longer give [plaintiff's] hospitalization . . . controlling

weight on the existence of a disability under the ADA."); <u>Owens v. Longo</u>, No. 06 Civ. 0281

(GLS) (DRH), 2008 WL 84594, at *6 (N.D.N.Y. Jan. 7, 2008) ("[A] plaintiff will not

automatically be found disabled upon presentation of records of a medical appointment or

surgery regarding an impairment."). Allowing the mere fact of Quintero's hospitalization to

establish a disability—with no evidentiary showing of how, if at all, the impairment for which

she was hospitalized imposed a substantial limitation, <u>see</u> <u>Colwell</u>, 158 F.3d at 645—would

recognize an impermissible, and wholly counterintuitive, exception to the ADA. Quintero

therefore cannot establish that she has a disability under the ADA because of a "record of

impairment."

### c.   Quintero Was Not "Regarded As" Disabled By Defendant

Quintero also asserts that she meets the third subsection of the ADA's definition of
disability because Rite Aid regarded her as having a disability.  Under this prong of the ADA's
disability definition, the decisive issue is not whether the employee has a disability, but whether
the employer regarded the employee as "'disabled *within the meaning of the ADA*.'"  Giordano v.
City of New York, 274 F.3d 740, 748 (2d Cir. 2001) (quoting Colwell, 158 F.3d at 646)
(emphasis in original).  The Supreme Court has explained that an individual can be "regarded as"
disabled within the meaning of the ADA in one of two ways:  "(1) a covered entity mistakenly
believes that a person has a physical impairment that substantially limits one or more major life
activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment
substantially limits one or more major life activities."  Sutton, 527 U.S. at 489.

Quintero has failed to put forth any evidence to demonstrate that Rite Aid regarded her as
substantially limited in her ability to perform a major life activity, or even to allege a specific
major life activity in connection with the "regarded as" disability definition.  Instead, Quintero
asserts that Jesman and Whalen's knowledge of her physical impairment is sufficient to prove
that they regarded her as disabled.  However, evidence that Quintero's supervisors knew of
Quintero's brain surgery, which Rite Aid concedes, has no bearing on whether Rite Aid regarded
Quintero as limited in a major life activity.  See Reeves, 140 F.3d at 153 ("mere fact that an
employer is aware of an employee's impairment is insufficient to demonstrate either that the
employer regarded the employee as disabled or that that perception caused the adverse
employment action") (internal quotation marks and citation omitted).  While Rite Aid was made
aware of Quintero's seizure disorder and corrective brain surgery, it was not informed that her
impairment substantially limited any major life activities.  Quite the opposite, in fact, as

27

Quintero's father instructed Quintero's supervisor that her seizures "had been largely under control" since the surgery and that she had received the "green light" to work. (Pl. Mem. at 11).

While Quintero's father did advise the supervisor of the possibility that Quintero could suffer another seizure on the job, that statement made no mention of any actual limitation from which Quintero may suffer. (Quintero Decl. ¶ 8). At her deposition, Quintero testified that following the surgery her doctor advised her "not to do . . . hard work," and that this warning prompted her father to speak with the supervisor at Rite Aid. (Quintero Tr.: 150:6-14). Even if Quintero's father had repeated the doctor's warning about "hard work" to Whalen or Jesman, that limitation is far too vague. To notify Whalen that Quintero was substantially limited in the major life activity of working, Quintero's father would have had to advise Whalen that Quintero was limited in "either a class of jobs or a broad range of jobs." 29 C.F.R. § 1630.2(j)(3)(i). The regulations further state that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); see Sutton, 527 U.S. at 493. "Hard work" does not constitute a particular job, much less a class of jobs or a broad range of jobs. See, e.g., Young v. Benjamin Dev. Co., No. 03 Civ. 10209 (RJS), 2009 WL 498933, at *7 (S.D.N.Y. Feb. 17, 2009) ("The need to limit [p]laintiff's tasks to 'light duty' suggests that an impairment may have *affected* his work," but does not "demonstrate that he suffered from a *substantial* impairment.") (emphasis in original).

Quintero further argues that Whalen's comments that she "had to do whatever [he] said because there were no papers in [Quintero's] file saying she had to be treated as differently than anyone else" support an inference that Rite Aid regarded her as disabled. (Pl. Mem. at 11). To reach this conclusion, Quintero would need to establish, under Sutton, either that Rite Aid believed Quintero had a physical impairment that substantially limited a major life activity, or

that Rite Aid mistakenly believed that Quintero's nonlimiting impairment substantially limited a major life activity. Under either application of the <u>Sutton</u> standard, Quintero cannot make the requisite showing.

At best, the evidence of Whalen's comments, which were made in the context of a disagreement over Quintero's ability to carry heavy cases of beer, promote a theory that Whalen regarded Quintero as unable to carry heavy boxes of merchandise. Even if Whalen did consider Quintero as having such a limitation, it is insufficient to prove a disability under the "regarded as" definition. A limitation on carrying heavy objects is a specific job function, not a specific job or a broad class of jobs, and so does not substantially limit Quintero's ability to work. "[T]he inability to satisfy the requirements of a particular assignment does not mean that such a person is regarded as handicapped." <u>Heilweil v. Mount Sinai Hosp.</u>, 32 F.3d 718, 719 (2d Cir. 1994); <u>see</u> <u>Colwell</u>, 158 F.3d at 644-45 (inability to lift "very heavy objects" did not impair a major life activity); <u>Bethea v. Potter</u>, No. 08 Civ. 2789 (RWS), 2010 WL 423105, at *9 (S.D.N.Y. Feb. 5, 2010) (no substantial limitation of work where only limitation was inability to lift 70 pounds). Nor could such an activity itself be considered a major life activity. <u>See</u> <u>Epstein v. Kalvin-Miller Int'l, Inc.</u>, 100 F. Supp. 2d 222, 225 (S.D.N.Y. 2000) ("'strenuous activity' is not a major life activity cognizable under the ADA"). Quintero's apparent inability to carry heavy cases of beer does not mean that she was unable to successfully complete other responsibilities commensurate with her position, which she was, in fact, able to do. Her limitation is thus not sufficiently broad to satisfy the major life activity requirement under the ADA, and any perception by Rite Aid of that limitation is therefore insufficient. <u>See, e.g.</u>, <u>Murphy v. United Parcel Serv., Inc.</u>, 527 U.S. 516, 524-25 (1999) (no substantial limitation where petitioner unable to work as mechanic who drives commercial motor vehicle, but able to work as mechanic generally); <u>E.E.O.C. v. J.B. Hunt</u>

Transp., Inc., 321 F.3d 69, 75 (2d Cir. 2003) (driving freight-carrying tractor-trailer trucks over long distances for extended periods of time was "a specific job with specific requirements" and inability to perform that job did not preclude drivers from other types of truck driving). Even assuming, therefore, that Whalen's comments to Quintero suggested that he thought she had a limitation of some sort, that limitation would be insufficient to prove a disability under the "regarded as" subsection of the ADA's disability definition.

In sum, Quintero cannot establish that she was disabled under any of the ADA's definitions of disability. Given Quintero's failure to establish that she suffered from a disability under the ADA, she is unable to establish a prima facie case of discrimination on the basis of unequal terms and conditions of employment. The Court therefore finds it unnecessary to determine whether Quintero has suffered an adverse employment action for purposes of this claim, or whether Rite Aid had notice of Quintero's disability. See, e.g., Wright-Jackson v. HIP Health Plan, No. 07 Civ. 1819 (DFE), 2010 WL 624993, at *17 (S.D.N.Y. Feb. 19, 2010) (unnecessary to discuss remaining elements of prima facie discrimination case where plaintiff failed to establish one element).

### E. Hostile Work Environment Claims

Quintero separately alleges that Rite Aid violated the ADA by subjecting her to a hostile work environment on account of her disability. (Compl. ¶ 6, 7, 13).[12] "A plaintiff claiming hostile work environment based on disability must demonstrate that [she] is a member of the

---

[12]     As a threshold argument, Rite Aid contends, without citing to any authority, that Quintero's hostile work environment claim should be dismissed because such a claim under the ADA is improper. (Def. Mem. at 10). Rite Aid maintains that Quintero should have brought her hostile work environment claim under Title VII of the Civil Rights Act of 1964. (Id.). Although the Second Circuit has not explicitly held that a hostile work environment claim is cognizable under the ADA, see Ragusa, 381 F. App'x at 88, n.3, courts in this Circuit have analyzed ADA hostile work environment claims under the

protected class.  Which is to say, [she] must meet the definition of disability contained in the

ADA."  Weiss v. Hustedt Chevrolet, No. 05 Civ. 4230 (DRH) (MLO), 2009 WL 2132444, at *8-

9 (E.D.N.Y. July 13, 2009).  Because Quintero cannot establish that she was disabled under the

ADA, see supra Section II.D.1, her disability-based hostile work environment claim also fails.

See, e.g., Ragusa, 381 F. App'x at 88 n.3 (plaintiff's failure to establish that she is qualified

individual with disability defeats any hostile work environment claim based on disability);

Edwards v. Brookhaven Science Assocs., LLC, 390 F. Supp. 2d 225, 230-32 (E.D.N.Y. 2005)

(same).

## F. Retaliation Claim

Quintero alleges that as a result of her complaining about Whalen's hostile and

discriminatory behavior, Rite Aid retaliated against her by changing her job responsibilities,

reducing her hours, and ultimately terminating her employment.  (Compl. ¶¶ 9, 14, 18).  The

ADA prohibits an employer from retaliating against an employee for opposing "any act or

practice made unlawful by" the ADA.  42 U.S.C. § 12203(a).  To establish a prima facie case of

retaliation, Quintero must establish that (1) she was engaged in an ADA-protected activity, (2)

Rite Aid was aware of the activity, (3) she was subject to an adverse employment action, and (4)

a causal connection exists between her protected activity and the adverse employment action.

See, e.g., Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 123 (2d Cir.

2008); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  To prevail on her

retaliation claim, Quintero need not prove that she was disabled within the meaning of the ADA,

---

same standards as Title VII hostile work environment claims.  See, e.g., Monterroso v.
Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008); De La Cruz v.
Guilliani, No. 00 Civ. 7102 (LAK) (JCF), 2002 WL 32830453, at *9 (S.D.N.Y. Aug. 26,
2002).  Accordingly, the Court will consider Quintero's hostile work environment claim
as alleged under the ADA.

but must demonstrate "a good faith, reasonable belief that the underlying challenged actions of the employer violated th[e] law." Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999) (internal quotation marks and citations omitted); see also Sussle v. Sirina Prot. Sys. Corp., 269 F. Supp. 2d 285, 313 (S.D.N.Y. 2003) (applying Sarno). Quintero asserts that soon after she informed Whalen that she was going to report his conduct, she was terminated by Rite Aid. (Id. ¶ 9).

Quintero has established the first two elements of a prima facie case of retaliation. Her threat to report Whalen's conduct, which she believed was discriminatory and abusive, was an activity that is protected by the ADA. See, e.g., Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (protected activities include "making complaints to management"). In addition, Rite Aid was aware of Quintero's protected activity, as she expressed her intent to report Whalen's conduct directly to Whalen himself. (Compl. ¶ 9; Quintero Tr.: 148:2-15).

Having carefully reviewed the evidence, the Court finds that there is a genuine dispute as to whether Quintero was subject to an adverse employment action. While Rite Aid does not contest that termination is an adverse employment action, see Sista v. CDC Ixis North America, 445 F.3d 161, 169 (2d Cir. 2006) (termination is an adverse employment action), it contends that Quintero voluntarily resigned from her position. (Def. Mem. at 3, 9). To support the view that Quintero resigned, Rite Aid submits deposition testimony from several current and former Rite Aid employees, an employment manual, and written statements from Quintero's supervisors describing the events surrounding Quintero's departure in October 2007. According to Rite Aid, Durse and Jesman called a meeting with Quintero to discuss her behavior during a recent argument with Whalen, during which Quintero had been yelling at Whalen. (Durse Tr.: 21:22-29:6). Durse presented Quintero with a "Written Notice Form," which was an incident report to

document Quintero's insubordination. Quintero refused to sign the document, quit her job, and left the store. (Id.). Rite Aid also contends that Quintero could not have been terminated at her meeting with Durse because Durse did not have authority to terminate employees. (Def. Mem. at 9).

Quintero relies on her own deposition testimony to support the view that she was terminated. Quintero asserts that, a few weeks after an argument between Whalen and her, she was called into a meeting with Whalen and an unidentified regional manager. They presented Quintero with a "Written Notice Form," which contained details of the incident. (Quintero Tr.: 135:11-136:8, 146:6-14). They demanded that Quintero sign the form. (Id.). Upon her refusal to sign the paper, the regional manager threw the paper at Quintero and informed her that she was fired. (Quintero Tr. 135:11-136:8, 145:11-22). Quintero was then ordered to leave the store and wait for her ride outside. (Quintero Tr.: 164:6-20).

The question of whether Quintero was terminated from Rite Aid or that she quit is the very definition of a genuine issue of material fact. Given the conflicting versions of events, the Court is called upon to weigh the parties' evidence and make credibility determinations, which "are jury functions, not those of a judge[.]" Anderson, 477 U.S. at 255; see also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although the Second Circuit has recognized an exception to this rule where a plaintiff relies almost exclusively on her own testimony and where that testimony is contradictory and incomplete, that exception does not apply here. See Rojas v. Roman Catholic Diocese of Rochester, No. 10-4132-cv, 2011 WL 4552460, at *5-6 (2d Cir. Oct. 4, 2011) (district court properly disregarded plaintiff's deposition testimony as "sham evidence" because of

contradictions with prior statements and admissions); Jeffreys v. City of New York, 426 F.3d

549, 554-55 (2d Cir. 2005).  Rite Aid has not made any argument to establish that Quintero's

testimony is "so self-contradictory or implausible as to rule out crediting it." Bennett v. Vaccaro,

No. 08 Civ. 4028 (LTS) (MHD), 2011 WL 1900185, at *8 (S.D.N.Y. Apr. 11, 2011).  The

principal argument that Rite Aid advances to debunk Quintero's version of events is that because

Durse lacked authority to fire employees, she could not have fired Quintero. (Def. Mem. at 9).[13]

Rite Aid also contends that Quintero could not have been terminated for refusing to sign the

"Written Notice Form," as there is no such consequence for refusal to sign.  While these

arguments may be true as a matter of Rite Aid company policy, they by no means establish

conclusively that it was impossible for Quintero to have been fired at the October 4, 2007

meeting.  Such a determination is one for a jury. [14]

---

[13]  Rite Aid also relies on the "Written Notice Form" for a handwritten notation on the
reverse side that says "refused to sign; walk off job[,]" which presumably indicates that
Quintero refused to sign the document and resigned. (Ex. G, Dempsey Cert.).  Quintero
challenges the admissibility and authenticity of the reverse side of the form because while
the front side is dated September 14, 2007, the reverse is dated October 4, 2007. (Pl.
Mem. 14).  In addition, Quintero asserts that the reverse side was produced after the close
of discovery, which Rite Aid concedes. (Id.).  Notwithstanding the questions of
admissibility, which the Court need not resolve at this time, the form fails to establish
that Quintero was not terminated.

[14]  Quintero has failed to provide evidence to create a genuine issue as to whether she
suffered any other adverse employment actions in retaliation for her complaint to Whalen
about his behavior.  As a matter of law, an adverse employment action must be "more
disruptive than . . . an alteration of job responsibilities." Mathirampuzha v. Potter, 548
F.3d 70, 78 (2d Cir. 2008) (citation omitted).  Even if Quintero's alleged alteration of
responsibilities resulted in "significantly diminished material responsibilities," and could
therefore constitute an adverse employment action, that action could not be considered
retaliation.  Id. (citation omitted).  To prove causality, an adverse employment action
must take place after a plaintiff engages in a protected activity.  See, e.g., Slattery v.
Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (no causal nexus for
retaliation where adverse employment actions began five months prior to protected
activity).  Quintero does not allege, and the evidence does not suggest, that any of her
responsibilities were different after her September 4, 2007 argument with Whalen.

The final element to establish a prima facie case of retaliation is causation.  In addition to direct evidence, courts have held that a causal connection can be "established indirectly by showing that the protected activity was closely followed in time by the adverse action." Lovejoy-Wilson, 263 F.3d at 224 (internal quotation marks and citation omitted); see also Barkley v. Penn Yan Cent. Sch. Dist., No. 09-3975-cv, 2011 WL 3890442, at *3 (2d Cir. Sept. 6, 2011) (summary order).  While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish" a causal connection, courts have found proof of such causation where the protected activity and adverse employment action are one month apart.  Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001); see, e.g., Jute v. Hamilton Sunstrand Corp., 420 F.3d 166, 176 (2d Cir. 2005) (adverse actions within one month of protected activity could establish causal connection); Treglia, 313 F.3d at 721 (same).  Here, Quintero informed Whalen that she was going to report his allegedly discriminatory conduct on or about September 4, 2007.  The next day, Whalen told Jesman that Quintero was "insubordinate."  (Whalen Tr.: 104:22-106:12).  One month later, Quintero was allegedly terminated.  The temporal proximity between Quintero's protected activity and her alleged termination could lead a rational jury to find the requisite causal

---

In addition, Quintero's claim that Rite Aid retaliated against her by reducing her work hours is unsupported by any evidence other than Quintero's conclusory statements, which are insufficient to defeat summary judgment.  In fact, the record appears to indicate that Quintero's hours were not reduced.  According to earnings statements produced by Quintero—submitted to the Court by Rite Aid, not by Quintero—she worked 29.00 regular hours and .50 overtime hours between August 26, 2007 and September 8, 2007. (QUINTERO 000007, attached as Ex. E to the Dempsey Cert.).  Between September 9, 2007 and September 22, 2007, Quintero worked 39.50 regular and .20 overtime hours. (QUINTERO 000006, attached as Ex. E to the Dempsey Cert.).  It appears that, if anything, Quintero's hours were increased after she complained to Whalen about his behavior, which took place around September 4, 2007.  Given this record, Quintero cannot establish that her alleged reduction of hours or changed job responsibilities constitute adverse employment actions.

connection.  Accordingly, because Quintero's version of events, if credited, may lead to a finding of retaliation, summary judgment is not appropriate on Quintero's retaliation claim under the ADA.[15]

## G. ADA Termination Claim

To establish a prima facie case of discriminatory discharge under the ADA, Quintero must demonstrate that:  (1) Rite Aid is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability.  See, e.g., Ryan, 135 F.3d at 869-70.  As Quintero has not established that she suffers from a disability within the meaning of the ADA, she has failed to set forth a prima facie case for wrongful termination.  See, e.g., Witchard v. Montefiore Med. Ctr., No. 05 Civ. 5957 (JSR), 2009 WL 602884, at *21 (S.D.N.Y. Mar. 9, 2009) (granting summary judgment on wrongful termination claim where plaintiff's impairments were not disabilities under the ADA); Watson v. Arts & Entm't Television Network, No. 04 Civ. 1932 (HBP), 2008 WL 793596, at *10-15 (S.D.N.Y. Mar. 26, 2006) (same).  The Court therefore grants summary judgment to Rite Aid on Quintero's termination claim under the ADA.

## H. State Law Discrimination Claims

In the Complaint, Quintero alleges violations of the NYSHRL on the same grounds— unequal terms and conditions, hostile work environment, retaliation, and termination—as her federal discrimination claims.  (Compl. ¶¶ 16-19).  Although Rite Aid does not discuss

---

[15]   Quintero has met her burden to establish a prima facie case of retaliation.  Under the burden-shifting framework set forth in McDonnell-Douglas, the burden shifts to Rite Aid to offer a legitimate, non-discriminatory reason for Quintero's termination.  Rite Aid has offered no such reason; it simply denies the very fact that Quintero was terminated. Given Rite Aid's failure to meet its burden at this stage, summary judgment is inappropriate on Quintero's retaliation claim for this reason as well.

Quintero's state law claims in detail in its motion for summary judgment, it seeks to dismiss the Complaint in its entirety and argues that Quintero's "allegations are wholly unfounded and factually unsupported." (Def. Mem. at 2). In her opposition papers, Quintero makes no reference to her state law claims and asserts no arguments to establish a prima facie case of discrimination under the NYSHRL. In the entirety of Quintero's opposition papers, the New York Executive Law is mentioned only once—on the final page of Plaintiff's Rule 56.1(a) Counterstatement of Facts, in the context of disputing the legality of a Rite Aid company policy. (Pl. Statement ¶ 11).

 "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003). A district court "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." Lipton v. Cnty. of Orange, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2005); see also Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 363 n.9 (2d Cir. 2004) (claims abandoned where appellant mentioned, but did not present any argument, on state law claims). Courts have deemed state law discrimination claims abandoned where a plaintiff fails to address those claims in opposition papers. See, e.g., Thomas v. City of New York, No. 03 Civ. 1797 (CPS), 2007 WL 2156652, at *6 n.17 (E.D.N.Y. July 25, 2007) (disability discrimination claims under NYSHRL considered abandoned where plaintiff "provide[d] no argument" in opposition to motion to dismiss); Douglas v. Victor Capital Grp., 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (state law claims dismissed where only mention of NYSHRL in opposition papers was "a passing reference that [the] complaint was brought under both the ADA and the NYSHRL"). Since Quintero has failed to address her state law claims in

any manner in the opposition to the motion for summary judgment, those claims are deemed

abandoned, and summary judgment is granted to Rite Aid.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the motion for summary judgment is granted with respect to

Quintero's claims for unequal terms and conditions, hostile work environment, and termination

under the ADA, and for all claims under New York state law.  The motion for summary

judgment is denied as to Quintero's retaliation claim under the ADA.  The Clerk is directed to

close docket number 24.

The parties are directed to appear for a final pre-trial conference to set a trial date on the

retaliation claim on November 29, 2011 at 11:00 a.m.

**SO ORDERED.**

Dated: New York, New York
       November 10, 2011

JAMES L. COTT
United States Magistrate Judge